## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

**Myria Petrou**

       **Plaintiff,**

**V**                                     **COMPLAINT**

**UNIVERSITY OF MICHIGAN,**

**Defendant.**

---

MYRIA PETROU (In Pro Per)
3507 Veralta Drive
Cedar Falls, IA 50613
Phone: (626) 272-7393
petroumyria75@gmail.com

## TRIAL BY JURY DEMANDED
## <u>COMPLAINT</u>

NOW COMES plaintiff, MYRIA PETROU, in pro per who states in support of her complaint:

### I. <u>INTRODUCTION:</u>

1. This case involves the resignation of Dr. Myria Petrou from the University of Michigan (UM) in September 2018 (where she held the position of Assistant Professor at the time) under false pretenses and the subsequent blacklisting of Dr. Petrou within the radiology and medical community.

2.   The events outlined started after Dr. Petrou supported a research coordinator in the Department of Radiology in the fall of 2014 in reporting concerns of sexual harassment and retaliation.

## II.   JURISDICTION AND VENUE

3.   The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

4.   Plaintiff Dr. Myria Petrou  is a resident of the City of Cedar Falls, County of Black Hawk, State of Iowa.

5.   Defendant University of Michigan was at all times relevant, a Michigan public institution with an address of 500 S. State Street, Ann Arbor, Michigan 48109.

6.   Jurisdiction is conferred by 28 U.S.C. § 1332 given diversity of state citizenship and amount in controversy exceeding $75,000 as well as 29 U.S.C. § 2617.

7.   Jurisdiction and venue are proper in this court as Defendant's principal place of business is in Ann Arbor, Michigan.

## III.   THE PARTIES:

8.   The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

9.   Dr. Myria Petrou ( "Dr. Petrou") is a board certified radiologist/neuroradiologist with a stellar academic and clinical record. Dr. Petrou was born and raised in Nicosia, Cyprus, the only child of the late Petros and Maria Petrou, two high school teachers. Dr. Petrou graduated from the English School in Nicosia, Cyprus and went on to complete her undergraduate and medical school studies at the University of Cambridge in the UK under a prestigious Commonwealth Scholarship. Dr. Petrou then completed her radiology residency training at the University of Michigan and neuroradiology fellowships at the University of Michigan and Johns Hopkins. Dr. Petrou also holds a

2

Master's Degree in Clinical Research from the University of Michigan School of Public Health.

10. The University of Michigan is the number one public research university in the United States with $1.48B in research expenditures. The University of Michigan employs over 33,000 employees and has over $8B in total revenue for operating budget, one-third of the gross domestic product for Washtenaw County, Michigan. Michigan Medicine is a top 10 best health system in the United States according to the U.S. News and World Report.

## IV. STATEMENT OF FACTS:

11. Myria Petrou MA MBChB MS ("Dr. Petrou"), was recruited to the University of Michigan in 2009 by then chair Dr. Reed Dunnick and Vice Chair Dr. Ella Kazerooni from Johns Hopkins where she was on faculty.

12. Dr. Petrou joined the Division of Neuroradiology within the Department of Radiology at the University of Michigan along with her husband Dr. Bradley Foerster, both as instructional track Assistant Professors.

13. Dr. Petrou completed her undergraduate and medical school training at the University of Cambridge in the UK under a prestigious Commonwealth Scholarship.

14. Dr. Petrou completed her residency and one year of neuroradiology fellowship at the University of Michigan and had a stellar academic record, with both impeccable clinical credentials as well as extensive national and international presentations, publications and grants for which she won numerous awards.

15. Dr. Petrou completed her second year of neuroradiology fellowship at Johns Hopkins and was hired on as faculty at Johns Hopkins in July 2008.

16.  As junior faculty at the University of Michigan, Dr. Petrou had a successful career as a physician scientist, with again an impeccable clinical record as well as numerous presentations, publications, grants and awards as well as numerous successful professional collaborations within the institution as well as with other institutions such as Johns Hopkins and the University of Pennsylvania.

17.  Starting in the fall of 2014, Dr. Petrou supported Ms. Duaa Altaee a research coordinator in the Department of Radiology in reporting concerns of sexual harassment and retaliation by Dr. Robert Welsh.

18.  Dr. Welsh and Dr. Petrou's husband Dr. Foerster were principal investigators under a Multi-PI arrangement for NIH Grant R01 NS082304

19.  Ms. Altaee worked under grant NIH Grant R01 NS082304 as a research coordinator.

20.  Neurologist Dr. Eva Feldman was a funded co-investigator on the same grant.

21.  Dr. Petrou was a non-funded co-investigator under the same grant.

22.  Dr. Petrou accompanied Ms. Altaee to the University of Michigan Office of Institutional Equity (OIE) and answered numerous questions by investigator Mr. David Betts regarding the events in question.

23.  Dr. Petrou also accompanied her husband Dr. Foerster to OIE who also reported concerns of retaliation by Dr. Welsh as a witness to the sexual harassment and again answered numerous questions by Mr. Betts, the OIE investigator.

24.  Subsequently, in 2019 and following Dr. Petrou's resignation from the University of Michigan, the University of Michigan stated to the EEOC that Dr. Petrou had no involvement in the Altaee/Foerster OIE investigation and therefore any claims of retaliation by Dr. Petrou were "moot".

25.　The OIE investigation with respect to Dr. Foerster's claims was deemed as "insufficient evidence" to establish a charge of retaliation; OIE omitted 13/17 pieces of submitted evidence.

26.　The OIE report for Ms. Altaee was never provided to Ms. Altaee, a violation of Title IX.

27.　Subsequently attorney Daniel Tukel presented an OIE report for Ms. Altaee at Dr. Foerster's 5.09 proceedings in November, 2018.

28.　The OIE report for Ms. Altaee designated Ms. Altaee as a "reportee", a violation of Title IX.

29.　The OIE report for Ms. Altaee, omitted Ms. Altaee's 10+ pieces of evidence.

30.　The OIE report for Ms. Altaee used a weather forecast rather than the actual weather report to label Ms. Altaee as a "liar."

31.　Mr. Tukel echoed the labeling of Ms. Altaee as a "liar" during the 5.09 proceedings of Dr. Foerster.

32.　Dr. Petrou repeatedly emailed OIE including Tamiko Strickman, Associate Vice President of the University of Michigan's Office of Institutional Equity regarding these issues but never received a reply about the Title IX violations documented Ms. Altaee's OIE report.

33.　Following the conclusion of the OIE investigations, Dr. Petrou faced false allegations, along with Ms. Altaee and Dr. Foerster by research coordinator Sara Abraham, including a fabricated HIPAA violation.

34.　Sara Abraham was terminated for cause by Dr. Petrou after Dr. Petrou consulted with HR representative Ashanta Boarden who encouraged Dr. Petrou to terminate Ms. Abraham given the issues at hand.

35.  While advising Dr. Petrou to terminate Ms. Abraham, and unbeknownst to Dr. Petrou Ms. Boarden was encouraging Ms. Abraham to come forward with her false allegations against Dr. Petrou, Dr. Foerster and Ms. Altaee.

36.  The University of Michigan never informed Dr. Petrou of the full spectrum of allegations filed by Ms. Abraham and never informed Dr. Petrou that Ms. Abraham filed her allegations with HHS OCR.

37.  HHS OCR closed the entire Sara Abraham complaint as non-credible given that there was no basis for a HIPAA violation, as claimed by Ms. Abraham.

38.  University of Michigan continued to "investigate" the fabricated allegations but to this date has refused to release how Sara Abraham's allegations were adjudicated or any final investigation report, despite an ongoing litigated FOIA appeal, aside from an email confirming the HHS OCR findings that there was no basis for a HIPAA violation allegation on behalf of Ms. Abraham.

39.  Following the general false allegations filed by Sara Abraham against Dr. Petrou, Dr. Foerster and Ms. Altaee, Sara Abraham went on to file false allegations of data fraud against Dr. Foerster which were investigated by Dr. Ashton Miller and Dr. Sana Shakour in the winter of 2017 and found to be unsubstantiated.

40.  Dr. Petrou suffered a miscarriage in February 2017 at 12 weeks gestation.

41.  Dr. Petrou received her care at the University of Michigan for the pregnancy and miscarriage under Dr. Anita Malone.

42.  In April 2017, an anonymous character (unidentified to date) by the name of "Nick" appeared who claimed to be University of Michigan faculty and started making phone

calls through the University of Michigan switchboard spreading false criminal allegations against Dr. Petrou, and her husband Dr. Bradley Foerster.

43. "Nick" claimed to be a member of the cardiothoracic radiology division under Dr. Ella Kazerooni, and claimed to be a friend and confidante of Paul Cronin, a long term colleague of Dr. Petrou's who was also cardiothoracic radiology faculty member and in fact the fellowship director for the cardiothoracic radiology fellowship.

44. Aine Kelly, Paul Cronin's wife was also a faculty member in cardiothoracic radiology at the time.

45. "Nick" falsely claimed that Dr. Petrou and her husband were "extorting" Paul Cronin based on a fabricated and unsubstantiated claim of a "forged financial document."

46. The Ann Arbor Police used "Nick" to justify a search warrant on Dr. Petrou's accounts including the construction loan on Dr. Petrou's brand new home, which directly resulted in the loss of Dr. Petrou's home and all of her assets.

47. Dr. Petrou asked then radiology Chair Dr. Reed Dunnick to investigate "Nick".

48. Dr. Dunnick refused to investigate "Nick."

49. In the spring of 2017 Paul Cronin also informed Dr. Petrou in the presence of Ms. Altaee that the miscarriage Dr. Petrou had suffered was not an "accident" but the result of an intentional pharmacologic intervention by "Reed and company" referring to Dr. Dunnick and others.

50. Dr. Petrou was very upset but did not know what to make of that statement.

51. Paul Cronin had also told Dr. Petrou, Dr. Foerster and Ms. Altaee of a Russian scheme in the 2016 U.S. Presidential scheme to subvert the election.

52. Paul Cronin had told Dr. Petrou and Ms. Altaee that Dr. Petrou's mother, Maria Petrou, was a Russian spy.

53. Paul Cronin had told Dr. Petrou and Ms. Altaee that there was an elaborate Russian money laundering scheme going on in Ann Arbor, Michigan.

54. Once again, Dr. Petrou did not know what to make of Paul Cronin's statements.

55. Following, in June 2017 "Nick" reappeared and made false allegations of mental instability against Duaa Altaee's then husband Tarick Seifeddine.

56. Tarick was evaluated in the University of Michigan psychiatric emergency room and was found to be over the limit for alcohol but entirely psychiatrically stable.

57. Cronin denied any claims of extortion under oath in a deposition he gave on June 20, 2017. Cronin also denied any substantial knowledge regarding Dr. Petrou's pregnancy and miscarriage as well as stating that he did not recognize the voice of "Nick".

58. In July 2017 Dr. Petrou reported concerns regarding NIH Grant R01 NS082304 and Dr. Welsh's effort on the grant to HHS-OIG.

59. Dr. Petrou clarified in her reporting that she was married to Dr. Foerster as a potential conflict of interest and asked for an investigation.

60. Following, Paul Cronin asked for assistance from Dr. Petrou and Dr. Foerster to report concerns of radiology billing irregularities to the University of Michigan Office of General Counsel.

61. Paul Cronin dictated to Dr. Petrou an email outlining his concerns and directly implicating Dr. Ella Kazerooni, his direct supervisor.

62. Paul Cronin said he had evidence to back his claims.

63. Paul Cronin, Aine Kelly, Myria Petrou and Bradley Foerster all signed the email/agreed to report the concerns.

64. Following, the University of Michigan retained legal firm Hall Render to investigate the NIH grant as well as the billing concerns.

65. During this investigation Paul Cronin and Aine Kelly falsely stated that the billing concerns originated from Dr. Foerster.

66. When confronted with the false statement by Dr. Petrou, Cronin stated that he lied because he was afraid of Ella Kazerooni.

67. Immediately following the reporting of the billing concerns, "Nick" resurfaced and now made false sexual allegations against Dr. Petrou falsely claiming that she had an affair with Cronin, that Dr. Petrou's and Dr. Foerster's son was really Cronin's son and this fabricated sex scandal was the basis of the extortion of Cronin.

68. Dr. Petrou only found out about these false sexual allegations from "Nick" in October of 2017 and reported them to the Office of Institutional Equity.

69. The Office of Institutional Equity contacted Paul Cronin 18 times but Cronin refused to cooperate with the investigation.

70. Paul Cronin was not compelled to cooperate with the investigation despite UM Lead Counsel Timothy Lynch informing Dr. Petrou and Dr. Foerster that the University can compel faculty members to cooperate with university investigations.

71. Also, following the reporting of the grant and billing concerns in 2017, Dr. Petrou faced extensive retaliation against her career at the University of Michigan in terms of grant funding, collaborations, scheduling etc.

72. In the spring of 2018, Dr. Petrou shared some of her concerns about what had been going on and her upcoming promotion with then Dean Margaret Gyetko and Interim Chair of Radiology Ella Kazerooni.

73. Dean Gyetko acknowledged Dr. Petrou's concerns and after consulting with the Provost's office granted Dr. Petrou an extension to her tenure clock.

74. Dr. Petrou submitted her application for promotion and tenure to the Department of Radiology in April 2018.

75. Dr. Petrou was recommended for promotion and tenure by the Department of Radiology promotions committee in June/July 2018.

76. In the summer of 2018, Dr. Petrou found out that Reed Dunnick, Kara Morgenstern, Dean Carol Bradford and Dana Habers were making false and outlandish criminal allegations against Dr. Petrou and Dr. Foerster to the UM Police and the FBI.

77. Neither the UM Police/FBI nor the relevant parties ever informed Dr. Petrou or Dr. Foerster about any concerns.

78. Dr. Petrou also later found out that Kara Morgenstern in the summer of 2018 was trying to use a "contempt of court" allegation without a signed court order and via a proceeding with numerous other violations, all over false and ridiculous allegations of stolen and "counterfeit" orange cats to deprive Dr. Petrou and Dr. Foerster of their medical licenses.

79. In July 2018, Dr. Petrou also wrote to the Office of Clinical Affairs asking them to correct the medical record with respect to her reproductive history and miscarriage, offering recordings of her doctor visits to substantiate the needed corrections (**Exhibit A**).

80. Michigan Medicine has repeatedly refused to correct Dr. Petrou's medical record.

81. Adding insult to injury, Dr. Eva Feldman, in July 2018 banned Dr. Petrou from the ALS clinic citing an "ongoing OIG investigation" as justification.

82. This made execution of an ALSA grant impossible, which was important to Dr. Petrou's application for promotion and tenure.

83. Dr. Petrou recently found out that the OIG investigation of her concerns regarding NIH R01 Grant NS082304 was administratively closed in October 2017.

84. Dr. Petrou has also recently discovered that the FBI was also involved the investigation of NIH R01 Grant NS082304.

85. The University of Michigan never disclosed that the FBI was also involved in the investigation of the NIH R01 grant.

86. Upon information and belief, the FBI was included in the NIH grant investigation to allow the University of Michigan to delay/obstruct the investigation of the NIH R01 grant and suppress how the investigation was conducted.

87. Upon information and belief, this was part of the scheme to delay/obstruct the investigation until the University of Michigan could force out Dr. Petrou, Ms. Duaa Altaee, and Dr. Foerster.

88. Ms. Altaee was terminated in December 2017 while being on approved medical leave for PTSD secondary to the sexual harassment.

89. Dr. Foerster resigned in June 2019 due to a hostile work environment including sham/fabricated 5.09 proceedings/charges.

90. Among other things, the HHS-OIG has no record of the March 2, 2018 interview of Dr. Petrou and Dr. Foerster regarding the NIH R01 grant which occurred at the FBI office in Ann Arbor, Michigan.

91.   FBI Agent Sue Lucas never informed Dr. Foerster and Dr. Petrou that the FBI was investigating the grant.

92.   During the interview, Agent Sue Lucas focused her questions about Maria Petrou asking whether Maria Petrou "was a Russian agent or just a money launderer?"

93.   To which, Dr. Petrou responded "I know nothing about this.  You have to ask Paul Cronin."

94.   The HHS-OIG has no record of Special Agent Tyson Howard who ran the interview on March 2, 2018.

95.   To date, no one can find Special Agent Tyson Howard.

96.   The University of Michigan including UM Lead Counsel refused to investigate the identity of "Tyson Howard" even though the University of Michigan vetted Special Agent Tyson Howard as per Paul Cronin and Aine Kelly, Dr. Kazerooni brought in Special Agent Tyson Howard to interview Paul Cronin in the Radiology Chair's conference room shortly after the March 2, 2018 interview.

97.   In fact on May 1 2019, attorney Mr. Tukel dismissed Dr. Foerster's concerns that Special Agent Tyson Howard did not exist per the HHS-OIG during the 5.09 proceedings claiming that the concerns were unfounded since the March 2, 2018 occurred in the Ann Arbor FBI office.

98.   In July 2018, given everything and the hostile and unsafe work environment, Dr. Petrou who was in California at the time, asked Dr. Kazerooni to work remotely (given that other radiologists were working remotely at the time) until some of these issues could be resolved.

99.   Dr. Kazerooni refused Dr. Petrou's request.

100. UM Lead Counsel Timothy Lynch threatened Dr. Petrou instructing her to return to an unsafe and hostile work environment.

101. Dr. Petrou sent her resignation letter to Dr. Kazerooni on September 24 2018 effective September 30 2018 (**Exhibit B**).

102. Dr. Kazerooni accepted the resignation without asking Dr. Petrou any questions or offering counseling (**Exhibit C**).

103. Instead Dr. Kazerooni referred the resignation to the University of Michigan Police as "suspicious circumstances." (**Exhibit D**).

104. The University of Michigan Police kept the investigation open for months but never talked to Dr. Petrou, Dr. Foerster or Paul Cronin.

105. The University of Michigan Police claimed that they tried to get hold of Dr. Petrou through an old phone number, even though Dr. Petrou's correct, updated phone number was on record with the University of Michigan.

106. The University of Michigan Police had previously ignored reports of death threats against Dr. Petrou and Ms. Altaee and closed the investigation into those within just over an hour while mis-documenting the facts.

107. Following the resignation of Dr. Petrou, OIE issued an Assessment of Claims for Dr. Petrou's concerns over "Nick" stating they could not investigate as they could not determine the identity of "Nick" and documenting that Paul Cronin would not cooperate with the investigation despite being contacted 18 times.

108. Just as with Ms. Altaee's OIE report, OIE did not release a copy of the report to Dr. Petrou.

109. Instead, Mr. Tukel brought out both Ms. Altaee's and Dr. Petrou's OIE reports during the Dr. Foerster's 5.09 proceedings.

110. Following the resignation of Dr. Petrou from the University of Michigan, Paul Cronin sent Dr. Petrou an affidavit stating that all of "Nick's" sexual allegations were fabricated.

111. Following the resignation of Dr. Petrou from the University of Michigan Dr. Petrou found out that there was an FBI report marked "Do Not Distribute" at the University of Michigan from January/February 2018 documenting allegations of mental instability regarding Dr. Petrou and Dr. Foerster by Dr. Petrou's mother Maria Petrou and Dr. Petrou's late father Petros Petrou who was demented at the time.

112. Maria Petrou has stated that she never made claims of mental instability against Drs. Petrou and Foerster and has executed a recent affidavit. (**Exhibit E**).

113. The University has refused to disclose how they came into possession of the FBI report.

114. Maria Petrou has stated that she was never given a copy of the FBI report prior to obtaining a copy via the office of attorney Papantoniou in Nicosia, Cyprus, where Dr. Petrou deposited the report released to her by the University of Michigan FOIA Office.

115. Following her resignation in good standing from the University of Michigan, Dr. Ella Kazerooni and the University of Michigan and their affiliates and surrogates have gone on to blacklist Dr. Petrou from academic and private practice positions and to actively interfere in numerous and sinister ways with her employment and right to life, liberty and happiness.

116. Dr. Petrou has also applied for the same position she held in the Department of Radiology, Division of Neuroradiology prior to being approved for tenure and was not even granted an interview.

117. Dr. Petrou's qualifications are superior to the faculty hired for (non-tenured) the position when Dr. Petrou's qualifications were vetted for tenure.

118. When inquiring with current Department of Radiology Chair Dr. Vikas Gulani, Dr. Gulani stated that this decision is up to division chief Dr. Ashok Srinivasan.

119. Dr. Srinivasan and his wife have a close relationship with Dr. Ella Kazerooni.

120. Instead, Paul Cronin and Aine Kelly were promoted out to Emory University as full professors in the Department of Radiology.

121. It has recently emerged that neither Paul Cronin nor Aine Kelly have medical school transcripts on file at the University of Michigan.

122. Both Paul Cronin and Aine Kelly completed masters degrees at the University of Michigan for which such transcripts are an absolute requirement per Rackham School of Graduate studies.

123. As part of the overall scheme to discredit and target Dr. Petrou the University of Michigan has committed numerous violations of the FOIA as documented in the numerous litigated FOIA appeals that Dr. Petrou was forced to file with the Court of Claims in Michigan to obtain critical information to protect her employment.

124. Furthermore, almost everyone who has offered any meaningful assistance to Dr. Petrou and her family through this journey has faced significant and often sinister adverse action against their employment, family and general well-being.

125. In addition, Dr. Petrou has faced severe and pervasive interference with the employment that she has been only able to obtain after placing the University of Michigan on record which continues to date and includes sinister schemes interfering with patient care.

126. Dr. Ella Kazerooni has previously admitted defaming Dr. Petrou and specifically disseminating defamatory articles published by the Ann Arbor Observer nationally and internationally which has interfered with employment and other opportunities for Dr. Petrou and her husband Dr. Foerster.

127. In 2020, Dr. Petrou learned that Dr. Nicholas Reeser (who was a radiology fellow under Cronin and Kazerooni in 2017) appeared to be a voice match for "Nick."

128. Following, Cronin and Kazerooni have both refused to comment whether they recognize the voice of "Nick" which Dr. Petrou forwarded to them in recordings obtained via FOIA by the Ann Arbor Police.

129. The University of Michigan has repeatedly refused to come to a settlement to allow Dr. Petrou to work unimpeded which the University of Michigan's own counsel Daniel Tukel has said in front of a federal judge was an unreasonable position on the part of the University of Michigan.

130. Concurrently, in July 2019 Mr. Tukel informed the federal judge that if the University had any outstanding law enforcement documents Dr. Petrou should have access to them.

131. When periodically, physical safety concerns have emerged in the context of the events outlined above, UM lead counsel Tim Lynch refused to take any initiative or responsibility and instead referred Dr. Petrou to law enforcement when clearly law enforcement has been weaponized in this scheme to discredit and target Dr. Petrou.

132. As recently as on September 26 2021 Dr. Petrou, in an attempt to reach reconciliation and settlement wrote to the University of Michigan Regents and outlined the issues with her resignation under fraudulent pretenses, Paul Cronin's bizarre statements, the mishandling of her resignation by Dr. Kazerooni referring the matter to law enforcement

and blacklisting Dr. Petrou, the victim in the entire situation while "wishing Dr. Petrou well in her future endeavors" and asked the UM Regents to consider these matters as they direct a path forward (**Exhibit F**).

## FIRST CAUSE OF ACTION
### *Violation of Constitutional and Civil Rights*
### *Under 42 U.S.C. 1983*

133. Plaintiff Dr. Petrou realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

134. When the events alleged in this complaint occurred, Deputy Lead Counsel Kara Morgenstern, Lead Counsel Timothy Lynch, Dr. Reed Dunnick, Dr. Ella Kazerooni, Dr. Eva Feldman, "Nick" as well as Paul Cronin and Aine Kelly were acting within the scope of their employment.

135. When the events alleged in this complaint occurred, the University of Michigan Police were acting within the scope of their employment and under color of law.

136. At all times relevant, Defendant University of Michigan employed Deputy Lead Counsel Kara Morgenstern, Lead Counsel Timothy Lynch, Dr. Reed Dunnick, Dr. Ella Kazerooni, Dr. Eva Feldman, "Nick" as well as Paul Cronin and Aine Kelly and is liable for their acts.

137. At all times relevant, Defendant University of Michigan employed University of Michigan Police and is liable for their acts.

138. Defendant University of Michigan is also liable because of its policies, practices, and customs, which lead to this complaint of violation of 42 U.S.C. 1983.

139. Plaintiff Dr. Petrou's constitutional protected rights that Defendant University of Michigan violated include, but are not limited to the following:

a)   The right to seek judicial redress in the courts pursuant to the First Amendment to the U.S. Constitution;

b)   The rights against taking of property without due process pursuant to Takings Clause of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

c)   The right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

d)   The right to due process protected by the Fifth and Fourteenth Amendment to the U.S. Constitution;

e)   The right to confront one's accusers protected by the Sixth Amendment;

f)   The right to privacy, protected by the Ninth Amendment to the U.S. Constitution;

g)   The right to free speech and gather, protected by the First Amendment of the U.S. Constitution;

h)   The right to an accurate medical record under HIPAA;

i)   The right to be licensed and employed as a practicing physician and academic; and

j)   The right to life, liberty and happiness.

140.   The University of Michigan, acting under color of law, violated these longstanding constitutional rights of Plaintiff Dr. Petrou by running numerous secret police investigations against Dr. Petrou.

141.   The University of Michigan and its agents endorsed and furthered false allegations against Plaintiff Dr. Petrou and her husband by numerous parties who had documented financial and other incentives to pursue such false allegations without documenting or investigating conflicts of interest.

142. The University of Michigan ignored and obfuscated requests of investigation by Plaintiff Dr. Petrou and her husband which did not serve the agenda of malignant prosecution against Plaintiff Dr. Petrou and her husband and which would compromise and incriminate the false witnesses the University of Michigan employed to further an agenda of malignant prosecution.

143. The right to due process was violated by numerous parties of Defendant University of Michigan violating court rules and state statutes.

144. The right to fair and equal treatment was violated by numerous parties of Defendant University of Michigan who displayed bias towards Plaintiff Dr. Petrou and favored other parties with no justification.

145. The right to confront one's accusers were violated by not allowing Plaintiff Dr. Petrou to confront "Nick" or Paul Cronin in the setting of an official University investigation.

146. The right to privacy and right to free speech was violated by the University of Michigan.

147. The right to life, liberty and happiness was violated by the University of Michigan running numerous sham investigations and suffering from multiple violations and inconsistencies.

148. The right to life, liberty and happiness was violated by the University of Michigan through destroying Dr. Petrou's reputation and violating his right to use his extensive training and abilities to pursue an academic career including taking care of patients in an academic setting, teach students, and pursue research advances to treat fatal neurological diseases.

149. Further, the loss of Dr. Petrou's house and eviction from the house from the Plaintiff Dr. Petrou's home was directly caused and condoned by the Defendant University of

Michigan through the facilitation and subsequent cover-up of "Nick" resulting in the taking of property without due process.

150. The acts of the University of Michigan were not privileged.

151. Defendant University of Michigan, through its police department, acting under color of law, authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as the Plaintiff.

152. UM faculty Paul Cronin and Aine Kelly also violated Plaintiff's rights to life, liberty and happiness through making false allegations to the Ann Arbor Police via a proxy, i.e. "Nick."

153. Through the use of a proxy, these parties also violated Plaintiff's Sixth Amendment rights to confront one's accuser.

154. Further, UM faculty Paul Cronin and Aine Kelly interfered with Plaintiff's employment and as such the Plaintiff's right to life, liberty and the pursuit of happiness in a number of ways. These included making false statements regarding Plaintiff and her husband in University of Michigan investigations, refusing to participate in University investigations to clear Plaintiff's and husband's good names, and spreading false rumors at the work environment regarding Plaintiff and her husband directly or via proxy.

155. UM Faculty Ella Kazerooni interfered with Plaintiff's employment at the University of Michigan as well as subsequent outside employment.

156. UM Faculty Ella Kazerooni violated due process by accepting Plaintiff's resignation in good standing and subsequently referred the resignation to the UM police for "suspicious

circumstances" as well as using the resignation circumstances to interfere with outside employment opportunities.

157. The University of Michigan endorsed/refused to investigate "Nick" when asked by Plaintiff and subsequently ran a sham investigation into "Nick's" allegations without talking to the Plaintiff or the other relevant parties.

158. The University of Michigan endorsed/refused to investigate a federal agent ("Tyson Howard") used to intimidate and muzzle the Plaintiff in an effort to cover up its wrong-doing.

159. Based upon the above facts, federal agent "Tyson Howard" is presumed to be affiliated with and used as a proxy by the University of Michigan.

160. The actions of the University of Michigan have inflicted long term and ongoing damages to Dr. Petrou and her family including loss of their home and assets, destruction of their credit rating resulting in inability to purchase a home and other items, loss of long standing personal and professional relationships and disruptions of friendships and relationships of their children, loss of job stability, loss of place of worship, preclusion from expanding Plaintiff's family as planned/interference with reproductive rights, being forced to work in unsafe and hostile work environments and  compromise of extended family relationships.

## SECOND CAUSE OF ACTION
### *Defamation*

161. Plaintiff Dr. Petrou realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

162. Statements by the University of Michigan and its agents were untrue when made or made in reckless disregard for the truth.

163. Ella Kazerooni, Paul Cronin and Aine Kelly, acting under the umbrella of the University of Michigan propagated, broadcasted and amplified numerous defamatory statements published by the Ann Arbor Observer.

164. Ella Kazerooni published numerous false, unsubstantiated and defamatory statements in the August 31, 2018 annual review letter and refused to retract the defamatory statements.

165. Upon information and belief "Nick" was an agent of Kazerooni, Cronin and Kelly.

166. "Nick" made false criminal and sexual allegations against Dr. Petrou and her husband.

167. Upon information and belief Ella Kazerooni, Paul Cronin and Aine Kelly told other parties including other agencies, physicians and hospitals that Plaintiff Dr. Petrou was not a good, sound or trustworthy person and had committed criminal acts and other professional violations.

168. Kara Morgenstern in her role as Deputy Lead Counsel for the University of Michigan made false allegations against Dr. Petrou and her husband to the Michigan Professional Licensing Board (LARA) which were propagated to other state licensing boards in an effort to unlawfully defraud Dr. Petrou and Dr. Foerster of their medical licenses.

169. Kara Morgenstern in her role as Deputy Lead Counsel for the University of Michigan also made false allegations against Dr. Petrou and her husband to law enforcement.

170. These malicious statements were untrue when made and painted Plaintiff Dr. Petrou in a bad light.

171.  These malicious statements were untrue when made or made in reckless disregard for the truth.

172.  As a result of these actions, Plaintiff Dr. Petrou and her family suffered and continue to suffer severe emotional distress, loss of employment and earnings, loss of property and severe damage to reputation in both professional and social settings.

### THIRD CAUSE OF ACTION
*Fraudulent Misrepresentation*

173.  Plaintiff Dr. Petrou realleges and incorporates all preceding paragraphs.

174.  The University of Michigan and its agents made numerous fraudulent misrepresentations including but not limited to accepting Dr. Petrou's resignation in good standing and "wishing her well" in future endeavors while referring the resignation to law enforcement as "suspicious" and blacklisting Dr. Petrou from employment opportunities including refusing to offer Dr. Petrou an interview at the University of Michigan for a position she was clearly qualified for, given the departmental approval for promotion tenure prior to Dr. Petrou's resignation.

175.  The University of Michigan and its agents informed Dr. Petrou that there was an ongoing OIG investigation when the investigation was closed and concurrently using the closed OIG investigation to prevent Dr. Petrou from attending neurology clinic to recruit research subjects for a grant, in a direct sabotage of her promotion and tenure process.

176.  The fraudulent representations have resulted in extensive damages to the Plaintiff including but not limited to emotional distress, loss of property and assets, loss of employment and earnings.

## FOURTH CAUSE OF ACTION
### *Intentional Infliction of Emotional Distress*

177.  Plaintiff Dr. Petrou realleges and incorporates all preceding paragraphs.

178.  Behavior and actions of Defendant University of Michigan and/or agents including but not limited to Timothy Lynch, Kara Morgenstern, Reed Dunnick, Ella Kazerooni, Eva Feldman, Paul Cronin, Aine Kelly, Ashok Srinivasan and "Nick" as well as Kara Morgenstern thereof was extreme and outrageous.

179.  Said behavior by Defendant University of Michigan and/or agents thereof was intentional and reckless.

180.  If said behavior by Defendant University of Michigan and/or agents was not intentional it was at least grossly negligent with malice.

181.  The events above caused severe emotional distress to Plaintiff Dr. Petrou.

182.  At all relevant times Defendant University of Michigan acted maliciously, recklessly, intentionally or by reason of gross negligence or violation of the law and therefore liable to Plaintiff Dr. Petrou

183.  As a direct and proximate cause of the violations listed in this Complaint, Plaintiff Dr. Petrou has suffered and continues to suffer from severe and permanent emotional distress, embarrassment, damage to her professional and personal reputation, loss of home and assets, loss of employment and earning capacity. Plaintiff Dr. Petrou is entitled to compensatory, exemplary and punitive damages.

## FIFTH CAUSE OF ACTION
### *Retaliation in Violation of the Sarbanes-Oxley Act*
### *18 U.S.C. § 1514A*

184. As a separate cause and distinct cause of action, Plaintiff Dr. Petrou complains and realleges and incorporates all proceeding paragraphs by reference as if more fully set out herein.

185. At all material times Section 806 of the Sarbanes-Oxley Act of 2002 was in effect and binding on Defendant University of Michigan.  It prohibits employers such as Defendant University of Michigan from discharging, constructively discharging, demoting, threating, harassing or in a manner discriminating or retaliation against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company/institution relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, or other violations of federal law relating to fraud.

186. Defendant University of Michigan harassed, threatened, and related against Plaintiff Dr. Petrou and disclosed his entity as whistleblower after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of federal and state statutes, rules and regulation.  Plaintiff made these complaints to his employer, by and through its agents and employees.

187. Plaintiff Dr. Petrou is informed and believes, and thereon alleges that because of his making complaints regarding Defendant University of Michigan's illegal conduct and/or conduct Plaintiff Dr. Petrou reasonably believed to be illegal, Plaintiff Dr. Petrou was discriminated and retaliated against by Defendant University of Michigan after he made the aforesaid complaint about illegal conduct and/or conduct that Dr. Petrou reasonably believed to be illegal.

188. As a direct cause and proximate result of Defendant University of Michigan's actions, Plaintiff Dr. Petrou has suffered and continues to suffer pain and mental anguish and emotional distress.

189. Plaintiff Dr. Petrou has further suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff Dr. Petrou is entitled to general compensatory damages in amounts to be proven at trial.

190. Defendant University of Michigan's actions constituted a willful violation of the afore-mentioned federal laws and regulations.  As a direct result, Plaintiff Dr. Petrou has suffered and continues to suffer substantial losses related to loss of wages is entitled to recover costs and expenses in seeking to compel Defendant University of Michigan to fully perform its obligations under state and federal law in amounts according to proof at time of trial.

191. The conduct of Defendant University of Michigan described hereinabove was outrageous and was executed with malice, fraud, and oppression, and with conscious disregard for Plaintiff Dr. Petrou's rights, and further, with the intent, design, and purpose of injuring Plaintiff Dr. Petrou.

192. Defendant University of Michigan committed the acts alleged hereinabove by acting knowingly and willingly, with the wrongful and illegal deliberate intention of injuring Plaintiff Dr. Petrou, from improper motives amounting to malice, and in conscious disregard of Plaintiff Dr. Petrou's rights.  Plaintiff Dr. Petrou is thus entitled to recover nominal, actual, compensatory, punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies allowable by law.

193. As a proximate result of the actions and conduct described hereinabove, which constitutes violations of Section 806 of the Sarbanes-Oxley Act of 2002, Plaintiff Dr. Petrou has been damaged in an amount according to proof at the time of trial and seeks make whole relief, civil penalties against Defendant University of Michigan pursuant to the Sarbanes-Oxley Act of 2002.

194. Plaintiff Dr. Petrou was damaged by these actions including but not limited to, severe and permanent emotional distress, physical pain and suffering, fear, mortification, and other damages that may be determined through discovery.  Plaintiff Dr. Petrou is entitled to compensatory, exemplary, and punitive damages.


## IV.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant for the following:

A. An immediate injunction where no information from the University of Michigan can be used against Dr. Petrou's medical licensing and credentialing until final resolution of this case.

B.  An order declaring the conduct of the Defendant University of Michigan unconstitutional.

C. An order for the Defendant University of Michigan to issue a public apology for its actions.

D. Plaintiff Dr. Petrou prays for restoration of his academic faculty position at the University of Michigan with credit given for lost time and grade.

E. Plaintiff Dr. Petrou prays for the restoration of ownership of his property of 630/620 Geddes Ridge, Ann Arbor, Michigan which is currently owned by faculty at the University of Michigan.

F. Litigation/court costs reasonably incurred in this action.

G.  Award any other relief that this Honorable Court finds just and equitable.

H.  Award any other relief that this Honorable Court finds just and equitable.

## **JURY DEMAND**

**Plaintiff respectively demands a jury trial on all issues so triable.**

Dated:  September 26, 2021

_____

Myria Petrou (In Pro Per)

3507 Veralta Drive

Cedar Falls, IA 50613

(626) 272-7393

Petroumyria75@gmail.com

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Myria Petrou                                          Judge: Pending assignment

PLAINTIFF                                             Case: Pending assignment


In pro per

3507 Veralta Drive

Cedar Falls IA 50613

626-2727393

Petroumyria75@gmail.com

Vs


University of Michigan

DEFENDANTS

**INDEX OF EXHIBITS FOR COMPLAINT:**


Exhibit A:  Letter of Myria Petrou to UM Office of Clinical Affairs, July 16 2018

Exhibit B: Resignation letter of Myria Petrou dated September 24 2018

Exhibit C: Acceptance of resignation by Ella Kazerooni dated September 25 2018

Exhibit D: UM Police investigation into Dr. Petrou's resignation

Exhibit E: Maria Petrou affidavit July 23 2021

Exhibit F: Email of Dr. Petrou to UM Regents dated September 26 2021


RESPECTFULLY SUBMITTED:

Myria Petrou

3507 Veralta Drive

Cedar Falls IA 50613

626-2727393    petroumyria75@gmail.com

# Exhibit A

Myria Petrou, MA MBChB MS
Assistant Professor
Department of Radiology
The University of Michigan
Ann Arbor, Michigan 48109
(734) 232-2911
mpetrou@med.umich.edu



**University of Michigan
Medical School**

July 16, 2018

Dear UM Office of Clinical Affairs,

I am an Assistant Professor in the Department of Radiology. I recently reviewed my personal health record and have discovered some important omissions and errors/ misdocumentation that I am writing to inform you about and ask that you investigate and correct as indicated.

On 2/21/2017 I had a "dilatation and curettage" or "manual vacuum extraction" for retained products of conception at Mott Hospital by Dr. Anita Malone. The operative note states that "I desired surgical management". This is incorrect. In fact, at my end of first trimester obstetric appointment I had with Dr. Malone, on 2/16/2017, where no fetal heart tone was detected, Dr. Malone discussed the different options of dealing with retained products of conception which included: "letting nature take its course", that is taking no medical action vs "giving medication to assist me pass the products" vs doing a manual extraction which could be performed in an outpatient clinic setting under mild sedation vs the most drastic option which was to have a manual extraction under deep sedation in the operating room.

Dr. Malone told me I could think about my options and ordered a diagnostic ultrasound to be performed in the Department of Radiology on 2/17/2017. After the ultrasound which confirmed the absence of a fetal heart tone I contacted Dr. Malone and I stated that I wanted to "let nature take its course". I was, to my surprise, advised against this option at this point by Dr. Malone and she scheduled me for an appointment and potential manual extraction at the UM Obstetrics Clinic in Northville for 2/20/2017. This discussion was not documented in the medical record.

On 2/20/2017 I called the Northville clinic to inquire about the time of the appointment/ potential reschedule and asked to speak with Dr. Malone. I received a call from the Northville clinic stating that I had been rescheduled for the procedure under deep

Myria Petrou, MA MBChB MS
Assistant Professor
Department of Radiology
The University of Michigan
Ann Arbor, Michigan 48109
(734) 232-2911
mpetrou@med.umich.edu



**University of Michigan
Medical School**

sedation in the Mott OR based on Dr. Malone's review of the case as Dr. Malone felt it was best to have the procedure in the operating room, under "controlled conditions".

Once again, these discussions are not accurately reflected in the medical record and the statement that "I desired surgical management" is both false and misleading. In fact, this escalation of reported risk where I went from being counseled that I did not have to seek any further medical care to essentially being told I have to go to the operating room for this procedure caused me even greater anxiety at a time of stress and loss.

On 3/20/2017 I had my postoperative visit again at the UM Northville OB clinic with Dr. Malone. For this visit I was accompanied by my husband, Dr. Bradley Foerster, MD PhD, Associate Professor at UM Radiology. We had an extensive discussion with Dr. Malone regarding the miscarriage and allowing for one regular menstrual cycle before trying again to have a child. Brad and I both expressed how upset we were about the pregnancy loss and our desire to try again to have a child in the near future and Dr. Malone said that she was hoping to see us again soon for a prenatal visit. There is no mention of Dr. Foerster being present for this visit and no mention of ANY discussion regarding how we were dealing with the pregnancy loss and our plans for a future pregnancy in Dr. Malone's note. I have written and read thousands of medical notes in my career and I understand that documenting these kinds of discussions with patients and families forms an integral part of the medical record.

On 6/15/2017 I had an appointment with Dr. Malone to discuss contraception. I explained to her that even though me and my husband wanted to have another child we were under incredible stress due to litigation with ▓▓▓▓▓▓▓▓ parties making false criminal allegations against us resulting in our house going into foreclosure. We specifically talked about the need for reliable contraception for the next few 5-6 months until "hopefully things settled down". We agreed that inserting an intrauterine device, given my good experience with this method in the past would be a good option and Dr. Malone was actually able to insert the device at this appointment even though I was not

Myria Petrou, MA MBChB MS
Assistant Professor
Department of Radiology
The University of Michigan
Ann Arbor, Michigan 48109
(734) 232-2911
mpetrou@med.umich.edu



**University of Michigan
Medical School**

originally scheduled for a procedure. The only documentation of this appointment is the IUD insertion procedure note that just states "Needs contraception" as an indication and again has NO information regarding our discussion.

I am requesting an investigation into the documentation of the events surrounding my 2017 pregnancy loss, the need for a manual extraction in the operating room, my postoperative visit and my 6/15/2017 visit with Dr. Malone as the documentation that is currently available under my personal medical record is inconsistent with my personal documentation of these visits and events. Furthermore, this information is critical in an Office of Institutional Equity investigation that in part focuses on the events surrounding my pregnancy loss and reproductive health issues. In addition the pregnancy loss has been part of other litigation so accurate and clear medical record documentation that meets established standards of care is of utmost importance.

Please feel free to contact me with any questions, I would be more than happy to discuss these concerns with you. Dr. Foerster would also be happy to provide information regarding these events as he was present my visits and discussions including my trip to the OR on 2/21/17.

Thank you for your attention to this critical matter.

Sincerely,

Myria Petrou, MA MBChB MS
Assistant Professor
Department of Radiology


Cc:     Dr. Ella Kazerooni, Interim Chair Radiology
        Dr. Margaret Gyetko, Senior Associate Dean for Faculty

# Exhibit B

Myria Petrou, MA MBChB MS
Assistant Professor
Department of Radiology
The University of Michigan
Ann Arbor, Michigan 48109
(734) 232-2911
mpetrou@med.umich.edu



**University of Michigan
Medical School**

September 24 2018

Dear Dr. Kazerooni and Dean Bradford,

I am writing to let you know that I am resigning from my position as Assistant Professor-Instructional Track in the Department of Radiology at the University of Michigan effective September 30 2018. I trust that this is adequate notice given the circumstances.

Over this past weekend I was laying in bed recovering from my recent surgery and going through some documents I recently obtained access to. I started listening to some audio recordings of my colleague Dr. Paul Cronin from February/March 2017. The first time I listened I just froze. Then chills went down my spine. And then the tears came. And the tears would not stop. Dr. Cronin was outlining in significant detail how the miscarriage I suffered at 12 weeks gestation in February 2017 was not an "accident" but rather the result of an intentional pharmacologic intervention by per Dr. Cronin, "Reed and company", referring to Dr. Reed Dunnick and other parties.

I kept playing the recordings trying to convince myself they were not real. But the details about places I had been at the time, people I interacted with, dates and times, tasks I completed, things I ate were too real, too accurate, too eerie.  I had never shared such mundane little details with anyone. As much as I did not want this story to be real I knew it was real. I knew I was sexually assaulted and Paul Cronin seemed to know all about it.

And suddenly everything started to make sense. The harassment, the retaliation, the rumors, the false criminal allegations, the conspiracy theories, the constant attempts to discredit me, the hostile work environment, the losses I have suffered in so many aspects of my life. I was hopeful that things would get better with the change in Departmental leadership. But unfortunately things have not improved. I reported my concerns to the highest levels within the University and for some reason nobody wanted to listen. And when I heard those recordings, I knew that the responsible thing to do for myself and my family is step out, process the assault, and figure out the path to healing.

I cannot even begin to explain how devastated, violated, hurt and cheated I feel. I gave a substantial portion of my life to the University of Michigan. I trust that my decision will be respected at this difficult time for me and my family.

Sincerely,

Myria Petrou MA MBChB MS

Cc:    Dean Marschall Runge, President Schlissel, Provost Martin Philbert,
         Dean Margaret Gyetko, Dr. Ashok Srininivasan, Mr. Timothy Lynch



Ella A. Kazerooni, M.D., M.S.
Interim Chair, Professor of Radiology
Professor of Internal Medicine
Department of Radiology/UH B1G503
University of Michigan Health System
1500 E. Medical Center Drive
Ann Arbor, Michigan 48109-5030
Phone: (734) 936-4346  ●  Fax: (734) 763-7318
E-mail:  ellakaz@umich.edu

September 25, 2018

**Myria Petrou, M.D.**
Assistant Professor, Instructional Track
Division of Neuroradiology
Department of Radiology
University of Michigan Medical School / Michigan Medicine

Dear Dr. Petrou,

I have received and read your letter, and accept your resignation effective September 30, 2018.

Your letter will be forwarded to other University offices for follow up on the matters described.

Thank you for your years of service at the University of Michigan. We wish you well in your recovery and in your future endeavors.

Sincerely,

Ella A. Kazerooni, M.D., M.S.
Interim Chair, Department of Radiology
Professor of Radiology & Internal Medicine

CC   Carol Bradford
       Dana Habers

 **Gmail**

---

# Fwd: Clarification regarding complaint and investigation

Mon, Feb 4, 2019 at 2:15 PM

---------- Forwarded message ---------
From: **Myria Petrou** <petroumyria75@gmail.com>
Date: Fri, Jan 25, 2019 at 7:42 AM
Subject: Fwd: Clarification regarding complaint and investigation
To: bpl-complaints@michigan.gov <bpl-complaints@michigan.gov>

Dear LARA Professional licensing complaints division,

Please see email below. Forwarding to you as directed and look forward to hearing from you about the complaint so I can defend myself against allegations made which I was never contacted about.

Thanks a lot

Myria Petrou
petroumyria75@gmail.com

---------- Forwarded message ---------
From: **BPLHelp** <BPLHelp@michigan.gov>
Date: Thu, Jan 24, 2019 at 4:43 PM
Subject: RE: Clarification regarding complaint and investigation
To: Myria Petrou <petroumyria75@gmail.com>

Good afternoon,

You will need to contact our Complaint Intake Department. They can be reached by email at BPL-Complaints@michigan.gov or by phone at (517) 241-0205.

Thank you,

Alexandria McGoron, Departmental Technician

Licensing Division

LARA/Bureau of Professional Licensing

PO Box 30670 – Lansing, MI 48909

Main Office:  (517) 335-0918



**From:** Myria Petrou <petroumyria75@gmail.com>
**Sent:** Thursday, January 24, 2019 10:45 AM
**To:** bplcomplaints@michigan.gov; BPLHelp <BPLHelp@michigan.gov>
**Subject:** Clarification regarding complaint and investigation

Dear Michigan LARA


I am a physician licensed in the State of Michigan and received my renewed license within the last week.

I just spoke to the Compliance division in your office and was shocked to find out that nobody had informed me that an allegation was filed against me on 7/18/2018 either from LARA or from the University of Michigan.

I understand that there is still an open investigation but nobody has reached out to me and I would respectfully request that I speak with someone so I can defend myself against any allegations.


Please let me know ASAP as this is a time sensitive issue.


I was on medical leave and away from work from the end of July to the end of September when I resigned from the University of Michigan in good standing for personal reasons (concerns of sexual assault which were communicated to the university).


You have my current mailing address on file which is


21 Willett Ave Apt 322

Port Chester NY 10573


My email is petroumyria75@gmail.com

My phone number is 626-2727393


Thanks for your assistance


Myria Petrou

# Exhibit C



Ella A. Kazerooni, M.D., M.S.
Interim Chair, Professor of Radiology
Professor of Internal Medicine
Department of Radiology/UH B1G503
University of Michigan Health System
1500 E. Medical Center Drive
Ann Arbor, Michigan 48109-5030
Phone: (734) 936–4346  •  Fax: (734) 763-7318
E-mail: ellakaz@umich.edu

September 25, 2018

**Myria Petrou, M.D.**
Assistant Professor, Instructional Track
Division of Neuroradiology
Department of Radiology
University of Michigan Medical School / Michigan Medicine

Dear Dr. Petrou,

I have received and read your letter, and accept your resignation effective September 30, 2018.

Your letter will be forwarded to other University offices for follow up on the matters described.

Thank you for your years of service at the University of Michigan. We wish you well in your recovery and in your future endeavors.

Sincerely,

Ella A. Kazerooni, M.D., M.S.
Interim Chair, Department of Radiology
Professor of Radiology & Internal Medicine

CC   Carol Bradford
        Dana Habers

# Exhibit D

# FREEDOM OF INFORMATION ACT OFFICE
**UNIVERSITY OF MICHIGAN**

January 8, 2019

Myria Petrou
820 E. Foothill Blvd Unit A
Monrovia CA 91016
petroumyria75@gmail.com

Re:   PET 0826-18

Dear Dr. Petrou:

I am writing in response to your Freedom of Information Act request dated December 10, 2018, which was received on December 11, 2018.

You requested, "all University of Michigan police records referring to me, Myria Petrou, UM ID 54143577 from 4/1/2018 to current."

It is my understanding that the University of Michigan Police Department provided you with two incident reports on July 16, 2018. Attached find one additional report. Some of the names listed in the report have been removed pursuant to Section 13 (1) (a) of the Michigan Freedom of Information Act, which allows the University to refrain from disclosing information that would constitute an unwarranted invasion of an individual's privacy and Section 13 (1) (b) of the Act, which protects from disclosure "[i]nvestigating records compiled for law enforcement purposes, but only to the extent that disclosure as a public record would . . . (iii) [c]onstitute an unwarranted invasion of personal privacy." Therefore, your request is granted in part.

Please note that within 180 days from the date of this letter, you have the right to appeal the denial of information to the President of the University or seek judicial review in the Michigan court of claims to try to compel disclosure. If you elect to appeal and the President upholds the denial, you may still seek judicial review within the 180-day period.

An appeal to the President must be submitted in writing to: President's Office, c/o Liz Barry, The University of Michigan, 2080 Fleming Administration Building, 503 Thompson Street, Ann Arbor, MI 48109-1340 (or by email to: presoff@umich.edu). The statement must (1) identify the request and the final determination by the FOIA officer that is being appealed, (2) specifically state the word "appeal," and (3) identify the reason or reasons why the final determination should be reversed.

If you seek judicial review in the Michigan court of claims and prevail, you will be awarded reasonable attorney's fees, costs and disbursements incurred in maintaining the action. If you prevail in part, you may still be awarded complete or partial reimbursement for those expenses. In



Myria Petrou
January 8, 2019
Page Two

addition to actual and compensatory damages, you will be awarded punitive damages in the amount of $1,000.00 if the court finds that the University was arbitrary and capricious in its denial.

A copy of Section 10 of the Michigan FOIA is available for your reference and review online at http://foia.vpcomm.umich.edu/foia-right-to-appeal/.

Sincerely,

Patricia J. Sellinger
Chief Freedom of Information Officer

Enclosure

| **UM - UNIVERSITY OF MICHIGAN** Case Report | PUBLIC SAFETY & SECURITY UNIVERSITY OF MICHIGAN | Case No. 1890304029 Case Status Not a Crime/Other Service Report Date/Time 10/12/2018 1:01:55 PM Reporting Officer West, Mark |
|---|---|---|

**FILE CLASS/OFFENSE:**
98007 - Inspections/Investigations - Suspicious Situations

**NATURE OF INCIDENT:**
98007/Susp. Incident/Hospital/Petrou/West

**OCCURRED ON:**          9/24/2018 12:00:00 AM
(and Between)

**VENUE:** 1500 E MEDICAL CENTER DR  ANN ARBOR, MI UNIVERSITY HOSPITAL
**CITY/TOWNSHIP:** 82 - U of M Ann Arbor, Washtenaw

---

**OTHERS:** Petrou, Myria          ENTITY TYPE          Other Person
U of M Affiliated: N - No
Affiliation Type:
UM ID:
Campus Address:
Alcohol/Drugs: N - No
Affiliation Notes:

| | | |
|---|---|---|
| RACE: White | DOB: 11/20/1975 | AGE: 42 |
| HGT: | SEX: Female | JUV: N - No |
| EYES: | WGT: | HAIR: |
| | ETH: O - Other Ethnicity/National Origin | Complexion: |
| Facial Hair: | Attire: | |
| SSN: | POB: | Resident: |
| DL Number: P360-619-018-888 | DL State: Michigan | DL Country: |
| Employer/School: | Employer Address: | |
| Occupation/Grade: | | |

ADDRESS INFORMATION:

  H - Home: 820 E Foothill Blvd Unit A Monrovia, CA  91016

Phone Information:                              Emails:

  M - Mobile: (734) 709-4679

NOTES:

---

| | |
|---|---|
| **UM - UNIVERSITY OF MICHIGAN**<br>**Case Report** | Case No.  1890304029<br>Report Date/Time: 10/12/2018 1:01:55 PM<br>Reporting Officer: West, Mark |

**NARRATIVE:**
UM-0178 - West, Mark
10/12/2018 1:20:53 PM
NATURE:
Suspicious Circumstances.

LOCATION:
This incident arose from subjects that worked at the University of Michigan Hospital, 1500 East Medical Center Drive, Ann Arbor MI 48109.

REPORT RECEIVED:
UMPD Criminal Investigations Unit Supervisor Lt. Paul DeRidder provided me with a resignation letter that the University of Michigan Office of the General Counsel provided him.   The letter was sent by former University of Michigan Assistant Professor Myria Petrou to Dr. Kazerooni and Dean Bradford.  This letter was also Carbon Copied (C.c'd) to Dean Marschall Runge, President Mark Schlissel, Provost Martin Philbert, Dean Margaret Gyetko, Dr. Ashok Srininivasan and Mr. Timothy Lynch.

RESIGNATION LETTER:

The letter was to announce that Myria Petrou was resigning from her position as "Assistant Professor-Instructional Track" in the Department of Radiology at the University of Michigan  effective September 30,2018.  The letter went on to explain how she was recovering from surgery and was listing to some audio recordings of her former colleague                         She explained how                "was outlining in significant detail how the miscarriage I suffered at 12 weeks gestation in February 2017 was not an accident but rather the result of an intentional pharmacologic intervention by per                     and Company, referring to                      and other parties".  She went on to write in this resignation letter how she kept playing the recordings and was trying to "convince myself they were not real, but the details about the places I had been at the time, people I interacted with, dates and times, tasks I completed, things I ate were too accurate, too eerie".  She said that she did not share these "Mundane little details with anyone", and that she "Knew I was sexually assaulted and            seemed to know all about it".  She went on to explain that everything that she had went through (harassment, retaliation, rumors, false criminal investigations, conspiracy theories, attempts to discredit, hostile work environments) suddenly all made sense.

ATTEMPT TO CONTACT:
I attempted to contact Myria Petrou at a listed number that I had, 734-709-4679 a couple of times, but have not been able to contact her as of yet.

CASE STATUS:
Open.

| Officer Narrative | PUBLIC SAFETY & SECURITY<br>UNIVERSITY OF MICHIGAN | Case No. 1890304029<br>Subject 98007/Susp.<br>Incident/Hospital/Petrou/West<br>Entered On: 1/4/2019 10:01:33 AM<br>Entered By: UM-0178 - West, Mark |

**Narrative:**

SUMMARY:

This report is in reference to a resignation letter written by former University of Michigan Professor Myria Petrou.

INFORMATION:

The resignation letter mentioned that Dr. Petrou had been sexually assaulted and that another staff member knew about it.

INVESTIGATION:

It is believed that Myria Petrou and her husband, Bradley Foerster, both reside in the state of California at the present time. I have made numerous attempts to contact Petrou by telephone, but have not been able to reach Petrou to obtain further information in reference to this incident.

This case will be closed due to lack of information.

CASE STATUS:

Closed.

| Officer<br>Narrative<br>Page 1 of 1 | Entered By: UM-0178 - West, Mark<br>Case No. 1890304029 | Printed: January 8, 2019 - 11:03 AM |

# Exhibit E

## <u>OATH STATEMENT</u>

I, the undersigned Maria Petrou, holder of Passport No. *6.44.008.74* declare that I have regular communication with my daughter Myria Petrou. In a recent e-mail she sent me she mentioned that both her and her husband, Bradley Roger Foerster, had received serious threats regarding their psychological state.

I assure that both my daughter Myria Petrou and her husband Bradley Roger Foerster, are in excellent psychological condition and are of sound mind and I authorize them to take legal action against those who harass them.



THE SWORN

*M. Petrou*

**MARIA PETROU**

Sworn and signed before me
On the ......23...|7......./2021
at the District Court of Nicosia

**THE REGISTRAR**

*ΣΤΕΛΙΟΣ ΚΩΝΣΤΑΝΤΙΝΟΥ*

# Exhibit F

 Gmail

Myria Petrou <petroumyria75@gmail.com>

## Another important dimension - our missing third child

2 messages

**Myria Petrou** <petroumyria75@gmail.com>                                    Sun, Sep 26, 2021 at 10:27 AM
To: jacker@umich.edu, mjbehm@umich.edu, mjbern@umich.edu, pwb@umich.edu, kewhite@umich.edu,
regenthubbard@umich.edu, rnweiser@umich.edu, dilitch@umich.edu

Dear UM Regents,

In November 2018, because I was unable to attend the 5.09 ad hoc committee hearings
against my husband Dr. Bradley Foerster, given that I was recovering from major surgery
in California and could not travel I sent a recording outlining some of the events
surrounding my resignation from the University of Michigan in good standing in September
2018.

I am attaching the recording I sent and which Dr. Foerster played during the hearings.

My recording accurately reflects my experience; yes my colleague Paul Cronin did tell me
these things. Whether they were true or not is a whole different story.

But then if Cronin said these things to me
knowing that they were not true every single person I have talked to about this issue from
all different cultures, backgrounds and walks of life said that this would not only be odd but
at the very least cruel.

Most women are quite upset and vulnerable after a miscarriage. I too was devastated.
And of course this was all compounded by everything else going on at the same time
including the whole "Nick" fiasco.

In my resignation letter I did ask for privacy and time to heal. And when I didn't hear
anything from the University of Michigan I thought my wishes were being respected. Little
did I know that in fact Dr. Kazerooni was referring my resignation to the UM Police for
investigation deeming it "suspicious". And that UM police would keep this "investigation"
open for months without talking to me, my husband or Paul Cronin. So what exactly was
the purpose of the "investigation" here? Discredit the victim of the situation? Deem me
crazy and not credible? Use it against future employment - which was in fact done? And if
that was the thinking why would the University accept the resignation without trying to
counsel me? I was on leave and approved disability anyway recovering from surgery. Was
it appropriate for Dr. Kazerooni to accept my resignation and at the same time deem it
suspicious ? And why on earth did the University of Michigan refuse to correct the
misdocumentations of my medical history and reproductive record surrounding the
miscarriage when I was offering them recordings of doctor's visits to substantiate the

needed corrections, under HIPAA?

When Dr. Foerster played the recording at the 5.09 hearings people found it, naturally, emotionally difficult. For I can promise you, it is entirely heart felt.  I could give you the same testimony in person today allowing for some pauses to pull myself together as the more the sense of loss has sank in the more difficult talking about it has been.

Attorney Daniel Tukel barged in to say that my account didn't count as I wasn't there to be interrogated by him. Well I am still here and I am not crazy or erratic. I have taken care of thousands of patients since that time and represented myself in litigation with Mr. Tukel being the opposing counsel.

Of note, my recording even though it was played at the as hoc committee hearings was NOT transcribed into the official transcript. Committee Chair Carol Bradford and Daniel Tukel tried to ask questions that were focused on me and my available evidence but refused to bring in Paul Cronin who was active University faculty at the time for testimony under oath. The committee also refused to bring in Ella Kazerooni who was also central to the very charges investigated along with Paul Cronin and Aine Kelly.

Irrespective of what happened in 2017 and how it was handled in 2018 the bottomline is that because of everything that happened to me and Brad via the 5.09 proceedings and the subsequent retaliation against our employment by the University of Michigan and parties affiliated and endorsed by the University (and which continues to date) we have not been able to have the third child we always wanted.

Right around the time of the initiation of the 5.09 proceedings we in fact saw a fertility specialist in California (a UM alum) who ran tests and said there should be no issues with a pregnancy. I also at the time found out about bizarre false and outlandish allegations made to the UM police and the FBI about me and Brad by Reed Dunnick, radiology administrator Dana Habers, Kara Morgenstern and Dean Bradford which nobody informed me about.

I asked Dr. Kazerooni to allow me to work remotely until some of these issues got resolved as she had granted such accommodations to other faculty. The response was Timothy Lynch threatening me and ordering me to return to an unsafe and hostile work environment.

Again I am sending you this to show you another huge dimension of the loss and the trauma we have suffered as a family. Whatever the circumstances surrounding the pregnancy loss the reality is that directly because of the actions of the University of Michigan our very much wanted third child is not here. And the sadness, the loss and the unfairness of the whole thing is overwhelming for me, for my husband and my other two children.

Again I thought it is important for you to consider these issues as you consider and direct

a path forward.

Thanks

Myria Petrou MA MBChB MS

---

📄 **New Recording 18.m4a**
3049K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Sun, Sep 26, 2021 at 10:27 AM
To: petroumyria75@gmail.com

? **Address not found**

Your message wasn't delivered to **rnweiser@umich.edu**
because the address couldn't be found, or is unable to receive
mail.

The response from the remote server was:

```
550 Requested action failed: User not found
```

Final-Recipient: rfc822; rnweiser@umich.edu
Action: failed
Status: 5.0.0
Remote-MTA: dns; mx2.a.mail.umich.edu. (3.20.94.70, the server for the domain umich.edu.)
Diagnostic-Code: smtp; 550 Requested action failed: User not found
Last-Attempt-Date: Sun, 26 Sep 2021 08:27:41 -0700 (PDT)

---------- Forwarded message ----------
From: Myria Petrou <petroumyria75@gmail.com>
To: jacker@umich.edu, mjbehm@umich.edu, mjbern@umich.edu, pwb@umich.edu, kewhite@umich.edu,
regenthubbard@umich.edu, rnweiser@umich.edu, dilitch@umich.edu
Cc:
Bcc:
Date: Sun, 26 Sep 2021 08:27:34 -0700
Subject: Another important dimension - our missing third child
----- Message truncated -----

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

County in which action arose: Washtenaw

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Myria Petrou

**DEFENDANTS**
University of Michigan

**(b)** County of Residence of First Listed Plaintiff   Black Hawk
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Washtenaw
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Myria Petrou (In Pro Per)
3507 Veralta Drive
Cedar Falls, IA 50613
(626) 272-7393

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1322 Civil Action for Fraudulent Misrepresentation under Diversity of State Citizenship in a Civil Action Exceeding $75K.
Brief description of cause:
Fraudulent Misrepresentation under Diversity of State Citizenship in a Civil Action Exceeding $75K.

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE _____   DOCKET NUMBER _____

DATE
September 26, 2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

# PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.　　　　Other than stated above, are there any pending or previously
　　　　　discontinued or dismissed companion cases in this or any other　☐ Yes
　　　　　court, including state court? (Companion cases are matters in which　☑ No
　　　　　it appears substantially similar evidence will be offered or the same
　　　　　or related parties are present and the cases arise out of the same
　　　　　transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :